IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SUNPOWER CORPORATION,

      Plaintiff,

      v.                                    C.A. No. 12-1633-GMS

PANELCLAW, INC.,

      Defendant.

## DECLARATION OF MATTHEW CULLIGAN

I, Matthew Culligan, declare as follows:

1.     I am an employee of Plaintiff SunPower Corporation ("SunPower"). I currently serve as Senior Product Manager, Commercial Rooftops, a position I have held since 2012. I have managed commercial and residential rooftop solar products at SunPower in various roles since 2007.

2.     As Senior Product Manager, Commercial Rooftops, I am responsible for developing, launching, and managing complete system solutions for SunPower, including mounting, photovoltaic ("PV") module integration, and monitoring for both products sold through SunPower's direct sales force and sales through its extensive dealer network. As part of my responsibilities, I assist in the sales and marketing of both SunPower products and third party products with which SunPower products are to be used, including preparing proposals for large-scale requests for proposals (RFPs) and other projects in the solar industry. As a result, I also monitor competitor activity and its impact on both our business and the success of our dealers.

3.      I have personal knowledge of the matters stated in this Declaration or have knowledge as a result of my routine activities performed as part of my general job responsibilities and would testify truthfully to them if called upon to do so.

4.      SunPower has been developing solar technologies since the 1980s and is the global leader in developing high-efficiency solar solutions for private residences, businesses, utilities, and city, county, state, and federal government customers.

5.      SunPower is the assignee and sole owner of U.S. Patent Nos. 5,505,788 (the "'788 patent") and U.S. Patent No. RE38,988 (the "'988 patent"), which pertain to mounting systems for photovoltaic ("PV") solar modules.  The '788 patent claims aspects of thermally regulated PV roofing assemblies and methods for making them.  The '988 patent is directed to aspects of lightweight PV assemblies that will not blow away even when laid loose on a roof without anchoring to the roof structure, as well as methods for making and installing such assemblies. True and correct copies of the '788 and '988 patents are attached as Exhibits A and B, respectively.

6.      SunPower designs and markets, among other things, rooftop mounting technology for solar power systems, including its T5 and T10 products, which SunPower believes embody the inventions claimed in the '788 and '988 patents.

7.      As reflected in the product brochure for T5 (a true and correct copy of which is attached as Exhibit C), T5 has a "lightweight design" combined with "a non-penetrating installation" and is "resistant to high winds."

8.      As reflected in the product brochure for T10 (a true and correct copy of which is attached as Exhibit D), T10 is "easy to install without mechanical roof attachments" and is "Highly Wind Resistant."

9.      SunPower markets its mounting systems in combination with SunPower PV panels and other associated products and services.  SunPower provides these products itself for large solar installation projects as well as through a network of authorized dealer-installers.

10.     Founded in 2007, PanelClaw is at present one of SunPower's primary competitors in the U.S. market for PV roofing assemblies.  Use of PanelClaw infringing mounting systems has enabled competing PV system installers to compete directly with SunPower as well as compete with SunPower authorized dealers and, indeed, has resulted in competition at those dealers themselves, who sometimes may opt to offer PanelClaw products for certain projects rather than SunPower's own competing solutions.

11.     A recent report by Seven Hills Partners LLC (a true and correct copy of which is attached as Exhibit E) notes that "PanelClaw is a rapidly growing supplier of PV mounting systems for flat roof and ground mount applications."  The report also notes that PanelClaw sells its mounting systems primarily to independent power producers, developers, Engineering-Procurement-Construction companies and installers in North America and Europe.  The report further notes that "PanelClaw's products have been proven on over 150 MWs of projects at more than 600 sites across North America."

12.     Within the last several years, PanelClaw has released a series of products that compete with SunPower's T5 and T10 product lines.  For example, PanelClaw sells a product called Polar Bear®, which competes directly with SunPower's T5 and T10 product lines in the market for installation of PV systems on building roofs.  As reflected in the product brochure for Polar Bear® (a true and correct copy of which is attached as Exhibit F), Polar Bear is a flat roof mounting system, which has an array platform load of ~2.5-9 PSF and can resist wind speed of up to 120 MPH.

13.     Similarly, PanelClaw sells a product called Grizzly Bear® that also competes directly with SunPower's T5 and T10 product lines in the market for installation of PV systems on building roofs.  As reflected in the product brochure for Grizzly Bear® (a true and correct copy of which is attached as Exhibit G), Grizzly Bear is a flat roof mounting system that has "the lowest lifecycle system costs of any product in its class."  Grizzly Bear® offers "low platform loads" of ~ 4 PSF and can resist wind speed of up to 100 MPH.

14.     As a result of PanelClaw's sale of its Polar Bear® and Grizzly Bear® roof mounting systems, SunPower has lost market share and sales opportunities for its own T5 and T10 products both in direct competition for solar installation projects and also through SunPower's dealer accounts.  The loss in sales and market share has resulted, in part, from the use of PanelClaw mounting systems to allow competitor installers to under bid SunPower on price.  In addition to lost opportunities for supply of its own mounting technology, SunPower has also lost business for sales of its PV modules and other related products and services.

15.     For example, PanelClaw Grizzly Bear was used by an electrical contractor to install an approximately 50 kW system in Walnut Creek, CA on the Police Station and City Hall buildings.   If PanelClaw had not provided the accused flat roof mounting system, a SunPower commercial dealer would have been more likely to win this project due to a more unique and compelling system designed and offered to the city.

16.     Additionally, SunPower has had to drop the price of its T10 mounting system in the Commercial Value Added Reseller ("CVAR") channel more than 15% over the last 18 months due to availability of alternate racking products that PanelClaw offers in the marketplace market.  Because such products are available to SunPower commercial dealers, price erosion has occurred in the commercial channel.

17.    If PanelClaw is not enjoined from selling the Polar Bear® and Grizzly Bear® roof mounting systems, I expect the price erosion, and loss of market share and loss of sales opportunities for SunPower's T5 and T10 products, and related products and services, to continue.

18.    On December 2, 2012, SunPower filed suit against PanelClaw in the United States District Court for the District of Delaware alleging infringement of SunPower's '788 and '988 patents.

19.    It is my understanding that after filing suit, SunPower did not immediately serve the Complaint on PanelClaw.  Instead, it is my understanding that SunPower informally sent a courtesy copy of the Complaint to PanelClaw, and inquired about PanelClaw's interest in settling the dispute without the need for litigation.  Beginning on December 13, 2012, I was involved on behalf of SunPower in a series of such discussions with PanelClaw over the months that followed.

20.    SunPower proposed a licensing arrangement in broad terms during initial telephone discussions.  A follow-up face-to-face meeting between the parties was scheduled on December 18, 2012, but was inexplicably canceled by PanelClaw on December 17, 2012.

21.    From June to July 2013, the parties again engaged in a business discussion but could not reach an agreement.

22.    The parties engaged in discussions again in November 2013.  During these discussions, SunPower proposed a licensing arrangement with specific terms in order to settle the dispute without litigation.  PanelClaw responded with a counter proposal which did not account for any past damages, and represented a total value more than an order of magnitude lower than the reasonable terms SunPower proposed.  PanelClaw also, inexplicably, asserted that it could

not settle past damages as doing so would require restating its earnings for all years of past operations. PanelClaw did not explain what restatements it, as a privately-held company, would be required to make.

      I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 13th day of March, 2014, at    _3pm  Pacific Time_

                                          Richmond, CA

Matthew Culligan