**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| SUNPOWER CORPORATION, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C. A. No. 12-1633-MPT |
| | : | |
| PANELCLAW, INC., | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM ORDER**

## I.    INTRODUCTION

This is a patent case.  On December 3, 2012, SunPower Corporation

("SunPower" or "plaintiff") filed suit alleging PanelClaw, Inc. ("PanelClaw" or

"defendant") infringes U.S. Patent Nos. 5,505,788 ("the '788 patent") and RE38,988

("the '988 patent").[1]  SunPower amended its complaint on January 24, 2013, and again

on April 15, 2013.[2]  PanelClaw filed its answer and counterclaims to the Second

Amended Complaint on May 29, 2013.[3]  Plaintiff answered defendant's counterclaims

on June 21, 2013.[4]  On March 18, 2016 defendant filed, pursuant to Federal Rule of

Civil Procedure 15(a) and D. Del. Local Rule 15.1, a Motion For Leave To Amend Its

Answer to the Second Amended Complaint, Affirmative Defenses And Counterclaims to

add counterclaims that the '788 patent and the '988 patent are unenforceable due to

---

[1] D.I. 1.
[2] D.I. 5 (First Amended Complaint); D.I. 16 (Second Amended Complaint).
[3] D.I. 18.
[4] D.I. 19.

inequitable conduct before the United States Patent and Trademark Office ("PTO").[5]   On

April 5, 2016, defendant filed a Motion For Leave To Supplement Its Motion to Amend

Its Answer To The Second Amended Complaint, Affirmative Defenses And

Counterclaims to include new information uncovered since the date of its original motion

to amend.[6]  This Memorandum Order sets forth the court's rulings on those motions.

## II.    NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff filed this action on December 3, 2012, alleging infringement of the '788

and '988 patents.[7]  Its complaint was amended twice, on January 24, 2013, and again

on April 15, 2013.[8]  PanelClaw filed its answer and counterclaims to the Second

Amended Complaint on May 29, 2013.[9]  Plaintiff answered defendant's counterclaims

on June 21, 2013.[10]  On October 18, 2013, defendant provided its preliminary

infringement contentions to defendant.[11]  On January 28, 2014, defendant filed petitions

for *inter partes* review ("IPR") seeking review of the asserted claims of the patents-in-

suit.[12]  On February 14, 2014, defendant filed a motion to stay pending resolution of the

IPR proceedings before the PTO,[13] which the court granted on May 16, 2014.[14]  On

---

[5] D.I. 84.
[6] D.I. 90.
[7] D.I. 1.
[8] D.I. 5; D.I. 16.
[9] D.I. 18.
[10] D.I. 19.
[11] D.I. 24.
[12] D.I. 94 at 3.
[13] D.I. 31.
[14] D.I. 43.  Prior to formally staying the case on May 16, 2014, during a status conference on November 22, 2013, the court clarified it had informally stayed the case and instructed the parties to refrain from any litigation activities.  D.I. 27 at 5:24-25, 12:25-13:1.

June 30, 2014, the PTO denied institution of IPR of all the claims of the '788 patent, denied institution of IPR of certain claims of the '988 patent, and granted institution of IPR with respect to claims 1, 55, 56, 78, and 79 of that patent.[15]  On April 3, 2015, the PTO issued a Final Written Decision on the '988 patent, finding claims 1, 55, 56, 78, and 79 unpatentable.[16]  On July 13, 2015, the court lifted the stay in this matter.[17]  The court entered a Scheduling Order on October 23, 2015 which set the deadline to amend pleadings on March 18, 2016.[18]  On March 18, 2016 defendant filed its motion to amend.[19]  On April 5, 2016, defendant filed its motion to supplement its motion to amend.[20]

## III.    STATEMENT OF FACTS

Thomas Dinwoodie, the only named inventor of both patents-in-suit, is also the named inventor of U.S. Patent No. 5,316,592 ("the '592 patent"), which is directed at subject matter that is similar to the '788 patent.[21]  Dinwoodie filed the application that led to the '592 patent on August 31, 1992, and he prosecuted the application himself.[22]  On June 29, 1994, less than a month after the '592 patent issued, Dinwoodie filed patent application number 267,499 ("the '499 application") which led to the '788 patent.[23]  The

---

[15] D.I. 94 at 3.
[16] *Id.*
[17] D.I. 44, 45.
[18] D.I. 57 ¶ 2.  On September 11, 2015, the parties filed a notice of consent to refer this matter to Chief Magistrate Judge Mary Pat Thynge for all purposes, including trial and final judgment.  The case was reassigned to Judge Thynge on September 16, 2015.  D.I. 49, 50.
[19] D.I. 85.
[20] D.I. 90.
[21] D.I. 85 at 3; *id.*, Ex. A at ¶ 45.
[22] *Id.* at 3; *id.*, Ex. A at ¶ 46.
[23] *Id.* at 3.

'788 patent is directed at a photovoltaic roofing assembly and all asserted claims include a "means for regulating the temperature" of the photovoltaic modules, which can be via (1) convective cooling through air circulating at the back of the modules, or (2) a phase change material at the back of the PV modules to remove heat from the modules.[24]

On April 8, 1996, Dinwoodie filed patent application number 08/629,052 ("the '052 application"), entitled "Lightweight, Self-Ballasting Photovoltaic Roofing Assembly."[25]  The application issued as U.S. Patent No. 5,746,839 ("the '839 patent") on May 5, 1998.[26]  The '839 patent reissued as the '988 patent on February 28, 2006.[27]  To overcome a rejection of all the pending claims of the '052 application, Dinwoodie argued to the examiner that the photovoltaic modules in the "cited art" "do not include access openings extending along at least two sides of the photovoltaic module."[28]

The '788 and '988 patents were previously litigated when SunPower sued SunLink Corporation  ("SunLink") in 2008 alleging infringement of the patents-in-suit ("the SunLink Case").[29]  In that litigation, SunLink deposed Dinwoodie on December 18, 2008 and again on January 14, 2009.[30]  On September 24, 2013, defendant served a Request for Production ("RFP") of documents from the Sunlink Case.[31]  In October

---

[24] *Id.*
[25] *Id.*, Ex. A at ¶ 100.
[26] *Id.*, Ex. A at ¶ 100.
[27] *Id.*, Ex. A at ¶ 100.
[28] *Id.*, Ex. A at ¶ 104.
[29] *SunPower Corp. Sys. v. SunLink Corp.*, C.A. No. 08-2807-SBA (N.D. Cal. June 5, 2008).
[30] D.I. 85 at 2; D.I. 94 at 4.
[31] D.I. 90, Ex. C; D.I. 21.

2013, defendant corresponded with plaintiff requesting that it respond promptly to the RFP in light of defendant's intention to file petitions seeking IPRs with respect to the patents-in-suit.[32]  Plaintiff did not produce the requested documents before defendant's deadline to file its IPR petitions.  On October 27, 2015, four days after the court entered a new scheduling order in this matter, defendant again served a RFP for documents from the SunLink Case.[33]  Following the filing of its October 2016 RFP, defendant sent numerous emails to plaintiff inquiring when its production would be forthcoming and noting the immediate need for the requested documents in light of the March 18, 2016 deadline for filing amended pleadings.[34]

On February 11, 2016, plaintiff produced documents from the SunLink Case, including the transcripts of the Dinwoodie depositions, along with the accompanying exhibits.[35]  Among the exhibits were two inventor notebooks that Dinwoodie allegedly created in the early 1990s.[36]  On February 19, 2016, plaintiff produced SunLink's Amended Answer and Counterclaims.[37]  It is these documents defendant relies on with respect to its March 18, 2016 motion to amend.  On February 26, 2016, plaintiff produced additional documents from the SunLink Case, including the expert report of Dr. Edward Kern, SunLink's expert report on the issue of patent invalidity.[38]  It is these documents produced on February 26, 2016 that defendant relies on with respect to its

---

[32] D.I. 90, Ex. D.  The correspondence noted defendant had previously informed plaintiff of defendant's intention to file IPRs with regard to the patents-in-suit.  *Id.*, Ex. D.
[33] D.I. 60.
[34] D.I. 97 at 5; D.I. 98, Exs. B-K, S.
[35] D.I. 85 at 2.
[36] *Id.*
[37] D.I. 97 at 4; *id.*, Ex. X.
[38] D.I. 90 at 2; *id.*, Ex. A at ¶ 138.

April 5, 2016 motion to supplement its motion to amend.[39]  After defendant reviewed the

documents produced on February 26, 2016, it contacted plaintiff on March 31, 2016 to

inquire whether plaintiff would oppose its request to supplement the proposed amended

answer.[40]  On April 4, 2016, plaintiff confirmed it would oppose defendant's request.[41]

Defendant filed its motion to supplement its proposed motion to amend on April 5,

2016.[42]

### A.    Allegations Regarding the '592 Patent

● Dinwoodie copied portions of the specifications, figures, and claims from U.S.

Patent No. 4,886,554 ("the '554 patent") to Wooding into Dinwoodie's '592

patent.[43]

● Dinwoodie made false statements regarding the Wooding '554 patent during the

prosecution of the '592 patent.[44]

### B.    Allegations Regarding the '788 Patent

● During the prosecution of the '788 patent, Dinwoodie filed a terminal disclaimer

over the '592 patent.[45]

● Dinwoodie did not disclose WIPO Pub. No. W094/00650 to Peter Toggweiler, et

al., dated January 6, 1994.[46]

● Dinwoodie did not disclose the article titled "Development of a Flat Roof

---

[39] D.I. 97 at 5-6.
[40] D.I. 90 at 2.
[41] *Id.*
[42] D.I. 90.
[43] D.I. 85, Ex. A at ¶¶ 48-49.
[44] *Id.*, Ex. A at ¶¶ 50-52.
[45] *Id.*, Ex. A at ¶¶ 54-55.
[46] *Id.*, Ex. A at ¶¶ 59-62.

Integrated Photovoltaic System (SOFREL®)," dated March 1994.[47]

- Dinwoodie did not disclose the article titled "PV Array Designs for Flat-Roof Buildings," by Edward Kern and Miles Russell, dated May 1993.[48]

- Dinwoodie did not disclose the installation of Ascension Technologies Roof-Jacks assemblies in 1992 and 1993 as disclosed in the Kern and Russell article.[49]

- Dinwoodie did not disclose a 1987 article by Martin K. Fuentes titled "A Simplified Thermal Model for Flat-Plate Photovoltaic Arrays."[50]

- Dinwoodie did not disclose a 1993 paper titled "Design Considerations and Performance of Maspeth a-Si PV System" by Byron Stafford, including a PV assembly in Maspeth, New York described therein.[51]

- Dinwoodie altered and backdated an Invention Disclosure document.[52]

- Dinwoodie altered and backdated his lab notebook.[53]

   C.    Allegations Regarding the '988 Patent

- Dinwoodie did not disclose WIPO Pub. No. W094/00650 to Peter Toggweiler, et al., dated January 6, 1994.[54]

- Dinwoodie did not disclose the article titled "Development of a Flat Roof Integrated Photovoltaic System (SOFREL®)," dated March 1994.[55]

---

[47] *Id.*, Ex. A at ¶¶ 59-62.
[48] *Id.*, Ex. A at ¶¶ 65-69.
[49] *Id.*, Ex. A at ¶¶ 65-69.
[50] *Id.*, Ex. A at ¶¶ 71-78.
[51] *Id.*, Ex. A at ¶¶ 80-83.
[52] *Id.*, Ex. A at ¶¶ 84-98.
[53] *Id.*, Ex. A at ¶¶ 84-98.
[54] *Id.*, Ex. A at ¶¶ 102-03.
[55] *Id.*, Ex. A at ¶¶ 102-03.

- Dinwoodie did not disclose the article titled "PV Array Designs for Flat-Roof Buildings," by Edward Kern and Miles Russell, dated May 1993.[56]

- Dinwoodie did not disclose the installation of Ascension Technologies Roof-Jacks assemblies in 1992 and 1993 as disclosed in the Kern and Russell article.[57]

- Dinwoodie did not disclose a 1993 paper titled "Design Considerations and Performance of Maspeth a-Si PV System" by Byron Stafford, including a PV assembly in Maspeth, New York described therein.[58]

- Dinwoodie made false statements regarding his '592 patent in response to the PTO's rejection of all of the claims of the '988 patent over the '592 patent in view of U.S. Patent No. 5,524,401 ("the '401 patent").[59]

- Dinwoodie filed a false declaration as to the reason for seeking reissue of the '839 patent.[60]

- Dinwoodie and his attorney submitted false declarations during prosecution of the '839 and '988 patents regarding Dinwoodie's PowerGuard product.[61]

- Dinwoodie submitted false and misleading declarations in the Reissue Application regarding his "special knowledge" in the area of wind uplift.[62]

### D. Allegations Regarding the IPR

- Plaintiff's counsel violated their duty of good faith and candor in dealing with the

---

[56] *Id.*, Ex. A at ¶¶ 102-03.
[57] *Id.*, Ex. A at ¶¶ 102-03.
[58] *Id.*, Ex. A at ¶¶ 102-03.
[59] *Id.*, Ex. A at ¶¶ 104-05.
[60] *Id.*, Ex. A at ¶¶ 110-17.
[61] *Id.*, Ex. A at ¶¶ 119-22.
[62] *Id.*, Ex. A at ¶¶ 123-28.

8

PTO in the IPR by not producing Kern's expert report to defendant in the litigation

and then making arguments to the Patent Trial and Appeal Board ("PTAB") that

were contradicted by the Kern report.[63]

## IV.    LEGAL STANDARDS

Pursuant to Federal Rule of Civil Procedure 15(a)(2), "a party may amend its

pleading only with the opposing party's written consent or the court's leave.  The court

should freely give leave when justice so requires."[64]  "The Third Circuit has adopted a

liberal policy favoring the amendment of pleadings to ensure that claims are decided on

the merits rather than on technicalities."[65]  The United States Supreme Court has stated

that although:

> the grant or denial of an opportunity to amend is within the discretion of
> the District Court . . . , [i]n the absence of any apparent or declared
> reason–such as undue delay, bad faith or dilatory motive on the part of the
> movant, . . . undue prejudice to the opposing party by virtue of allowance
> of the amendment, futility of the amendment, etc.–the leave sought
> should, as the rules require, be "freely given."[66]

"If a party moves for leave to amend the pleadings after a deadline imposed by a

Scheduling Order, Rule 16 of the Federal Rules of Civil Procedure is also implicated."[67]

Under Rule 16, "[a] schedule may be modified only for good cause and with the judge's

---

[63] D.I. 90, Ex. A at ¶¶ 130-48.

[64] FED. R. CIV. P. 15(a)(2).

[65] *Leader Techs., Inc. v. Facebook, Inc.*, C.A. No. 08-862-LPS, 2010 WL
2545959, at *3 (D. Del. June 24, 2010) (citing *Dole v. Arco Chem. Co.*, 921 F.2d 484,
487 (3d Cir. 1990)).  Whether to grant or deny "a motion to amend a pleading under
Rule 15(a) is a procedural matter governed by the law of the regional circuit."  *Exergen
Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1318 (Fed. Cir. 2009) (citing *Cent.
Admixture Pharmacy Servs., Inc. v. Advanced Cardiac Solutions, P.C.*, 482 F.3d 1347,
1357 (Fed. Cir. 2009)).

[66] *Foman v. Davis*, 371 U.S. 178, 182 (1962).

[67] *ICU Med., Inc. v. Rymed Techs., Inc.*, 674 F. Supp. 2d 574, 577 (D. Del. 2009).

consent."[68]  "After a pleading deadline has passed, the Third Circuit requires a showing

of good cause in order to amend."[69]  "Good cause" exists if the Schedule "cannot

reasonably be met despite the diligence of the party seeking the extension."[70]  "'In

contrast to Rule 15(a), the good cause standard under Rule 16(b) hinges on diligence of

the movant, and not on prejudice to the non-moving party.'"[71]

     Because defendant seeks leave to amend its affirmative defenses and

counterclaims to assert inequitable conduct and unenforceability before the PTO, the

heightened pleading standard of Federal Rule of Civil Procedure 9(b) applies to its

allegations.[72]  Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state

with particularity the circumstances constituting fraud or mistake.  Malice, intent,

knowledge, and other conditions of a person's mind may be alleged generally."[73]

"'[I]nequitable conduct, while a broader concept than fraud, must be pled with

particularity'" under Rule 9(b).[74]

> [T]o plead the "circumstances" of inequitable conduct with the requisite
> "particularity" under Rule 9(b), the pleading must identify the specific who,
> what, when, where, and how of the material misrepresentation or omission

---

[68] FED. R. CIV. P. 16(b)(4).

[69] *ICU Med.*, 674 F. Supp. 2d at 577 (citing *E. Minerals & Chems. Co. v. Mahan*, 225 F.3d 330, 340 (3d Cir. 2000)).

[70] FED. R. CIV. P. 16(b)(4) Advisory Committee's Notes (1983 Amendments).

[71] *ICU Med.*, 674 F. Supp. 2d at 577-78 (quoting *Roquette Freres v. SPI Pharma. Inc.*, C.A. No. 06-540-GMS, 2009 WL 1444835, at *4 (D. Del. May 21, 2009)).

[72] "Whether inequitable conduct has been pleaded with particularity under Rule 9(b) is a question governed by Federal Circuit law."  *Exergen*, 575 F.3d at 1318 (citing *Cent. Admixture*, 482 F.3d at 1356); *see also id.* at 1327 ("[W]e apply our own law, not the law of the regional circuit, to the question of whether inequitable conduct has been pleaded with particularity under Rule 9(b).").

[73] FED. R. CIV. P. 9(b).

[74] *Exergen*, 575 F.3d at 1326 (quoting *Ferguson Beauregard/Logic Controls, Div. of Dover Resources, Inc. v. Mega Sys., LLC*, 350 F.3d 1327, 1344 (Fed. Cir. 2003)).

committed before the PTO.  Moreover, although "knowledge" and "intent" may be averred generally, a pleading of inequitable conduct under Rule 9(b) must include sufficient allegations of underlying facts from which a court may reasonably infer that a specific individual (1) knew of the withheld material information or of the falsity of the material misrepresentation, and (2) withheld or misrepresented this information with a specific intent to deceive the PTO.[75]

## V.    DISCUSSION

A motion to amend should be granted in the absence of a showing of "undue delay," "bad faith or dilatory motive on the part of the movant," "undue prejudice to the opposing party by virtue of allowance of the amendment," or "futility of the amendment."[76]

Defendant seeks to amend its answer to allege that patents-in-suit as a result of its recent conclusion that inventor Dinwoodie violated his duty of candor and good faith in dealing with the PTO by intentionally and deceptively failing to disclose multiple prior art references, by making arguments to the Examiner that he knew to be false and misleading, and by submitting declarations that he knew to be false and misleading.[77] Defendant argues its motion for leave to amend to add inequitable conduct counterclaims should be granted because:  (1) the motion is timely and there was no undue delay on its part in seeking leave to amend; (2) the motion is not brought in bad faith or as a result of any dilatory motive; (3) the proposed amendment will not unduly prejudice plaintiff; and (4) the proposed amendment is not futile.[78]

Defendant seeks to supplement its proposed amended answer to include new

---

[75] *Id.* at 1328-29.
[76] *Foman v. Davis*, 371 U.S. 178, 182 (1962).
[77] D.I. 85 at 1.
[78] *Id.*

information purportedly uncovered since the date of its original motion to amend.[79]
Since the filing of that motion, defendant states it discovered that plaintiff and its
attorneys in the IPR of the '988 patent violated their duty of candor and good faith in
dealing with the PTO by withholding documents from defendant in the litigation and then
making misleading arguments to the Board that were contradicted by the documents
being withheld.[80]

Plaintiff argues the court should deny defendant's motions because it cannot
justify its undue delay and because the amendments are futile since the allegations fail
on their face to state a plausible claim of inequitable conduct.[81]  It also argues the
motions should be denied because they were purportedly brought for an improper
purpose, i.e., an effort to gain leverage in any upcoming settlement discussions.[82]

### A.    Undue Delay

Defendant maintains its motion for leave to amend is timely and there was no
undue delay on its part in seeking leave to amend.[83]  Because defendant filed its motion
within the deadline set in the court's October 23, 2015 Scheduling Order, which
provides that motions to amend the pleadings "shall be filed on or before March 18,
2016,"[84] the court finds defendant's motion was timely-filed.

Plaintiff nevertheless argues that, despite being filed within the time period set by

---

[79] D.I. 90 at 1.
[80] *Id.* at 1-2.
[81] D.I. 94 at 4.
[82] *Id.* at 1, 4, 25.
[83] D.I. 85 at 12.
[84] D.I. 57 at ¶ 2.

the scheduling order, defendant did unduly delay filing its motion.[85]

There is no undue delay based on the facts.  The efforts by defendant to obtain documents relating to the SunLink Case beginning with its September 2013 RPF and subsequent communication with defendant regarding that filing, its immediate re-filing of its RFP requesting documents in the SunLink Case after the court entered the scheduling order, and its timely and frequent requests to plaintiff to respond to this outstanding discovery refute any claim of undue delay.[86]

## B.    Bad Faith or Dilatory Motive

Plaintiff contends the timing of defendant's motions calls into question its motive for bringing both motions.[87]  Defendant filed its first motion on March 18, 2016, less than two weeks before a then-scheduled mediation conference.  Two weeks later, defendant filed a second motion accusing plaintiff and its IPR counsel of inequitable conduct before the PTAB.[88]  Plaintiff states defendant has taken no meaningful discovery to support any of its allegations and there is no reason why the allegations in the first amendment could not have been plead at the outset of the case as opposed to after the IPR proceedings resolved in plaintiff's favor.  Plaintiff contends defendant's motive for bringing both of its proposed amendments is obvious—having purportedly failed in its

---

[85] One of plaintiff's complaints is that defendant allegedly did not seek discovery from third-party SunLink to obtain the documents it sought.  D.I. 94 at 10.  Defendant did subpoena SunLink for the documents it sought.  In response, SunLink objected that the information should be obtained from SunPower, who filed this suit.  D.I. 97 at 4-5; D.I. 98, Exs. U, V.  Defendant sent the SunLink subpoena to plaintiff's counsel before serving it.  D.I. 97 at 5; D.I. 98, Ex. A.

[86] The case was informally and formally stayed from November 22, 2013 until July 13, 2015.  D.I. 27 at 5:24-25, 12:25-13:1; D.I. 43; D.I. 44, 45.

[87] D.I. 94 at 25.

[88] *Id.*

IPR attempts and having failed to obtain summary judgment of invalidity of the '988 patent, defendant's motions are simply an effort to gain leverage in any upcoming settlement discussions.[89]

The court first notes that defendant filed its motion to amend on March 18, 2016. The court did not issue its Memorandum Opinion denying defendant's summary judgment motion of invalidity until April 1, 2016.  Therefore, failure to obtain summary judgment of invalidity of the '988 patent, of which it did not know at the time, could not have been a motivating factor for defendant to file its motion to amend.  A mediation conference had initially been scheduled to take place on March 30, 2016.[90]  The court cancelled that mediation on March 24, 2016.[91]  Defendant filed its motion to supplement on April 5, 2016.[92]  The court did not reschedule the mediation until May 4, 2016.[93] Therefore, seeking leave to supplement its proposed amended answer could not have been motivated by a desire to gain settlement leverage by filing shortly before a mediation conference, which had not been rescheduled when defendant filed its motion to supplement.

Although plaintiff includes the "failure" of defendant's IPRs as reason to believe its motive for filing the instant motions was nothing more than an attempt to concoct settlement leverage, defendant notes its IPRs were not the failures suggested by

---

[89] Id. at 1, 4, 25.
[90] D.I. 80.
[91] D.I. 86.
[92] D.I. 90.
[93] D.I. 99.  The mediation conference is currently scheduled for September 28, 2016.  *Id.*

plaintiff.[94]   Those IPRs resulted in summary judgment of no literal infringement of the '788 patent when this court adopted the PTAB's construction of a particular limitation and applied that construction to the evidence supporting defendant's motion for summary judgment of non-infringement.[95]   Also as a result of the IPR of the '988 patent, several independent claims were found unpatentable as anticipated.[96]

Defendant maintains its proposed amendment could not have come as a surprise to plaintiff, and moving to amend was not a last minute decision on defendant's part.[97] Shortly after this case began, defendant informed plaintiff it was aware that inequitable conduct allegations had been raised in the SunLink Case.[98]   Defendant requested that plaintiff produce documents from the SunLink Case in sufficient time to allow defendant to amend its answer prior to the March 18, 2016 deadline to do so.[99]

Based on the foregoing, the court finds defendant did not files its motions in bad faith or as a result of dilatory motive.

## C.   Undue Prejudice

Defendant contends its proposed amendment will not unduly prejudice plaintiff because *all* the evidence supporting its inequitable conduct claims is either already known or within plaintiff's control.[100]   Plaintiff is already in possession of the documents forming the basis for defendant's inequitable conduct counterclaims which plaintiff

---

[94] D.I. 97 at 6.
[95] D.I. 88.
[96] D.I. 71, Ex. G (PTAB Final Written Decision) at 12.
[97] D.I. 97 at 7.
[98] D.I. 98, Ex. T (January 15, 2013 email).
[99] *Id.*, Exs. S, H.
[100] D.I. 85 at 13, 14.

produced in its litigation against SunLink and has now produced to defendant in this case.[101]

Notably, although plaintiff argues undue delay and improper motive on the part of defendant, and the futility of its allegations of inequitable conduct, it does not set forth any specific argument that it would be unduly prejudiced, the "touchstone for the denial of an amendment," were the court to grant defendant's motion.[102]

"In the Third Circuit, '[t]he non-moving party has the burden of proving that actual prejudice will result from the amendment . . . .'"[103] Having not argued undue prejudice, the court finds that plaintiff would not be so prejudiced. There is no indication that plaintiff will be unfairly disadvantaged or deprived of the opportunity to present facts or evidence which it could have offered.[104] Here, "the availability of the information regarding [defendant's] inequitable conduct is primarily within the control of [plaintiff]."[105] Plaintiff is already in possession of the documents on which defendant's motions are based.[106] Plaintiff acquired Dinwoodie's company PowerLight (including the patents-in-

---

[101] *Id.* at 14. *See, e.g., Roquette Freres v. SPI Pharma, Inc.*, C.A. No. 06-540-GMS, 2009 WL 1444835, at *5 (D. Del. May 21, 2009) (finding no prejudice where "[i]nformation regarding the inventors' knowledge and what they did or did not . . . [represent] to the PTO would primarily be within the control of [plaintiff].").

[102] *See Arthur v. Maersk, Inc.* 434 F.3d 196, 204 (3d Cir. 2006) ("Among the factors that may justify denial of leave to amend are undue delay, bad faith, and futility. We have consistently recognized, however, that prejudice to the non-moving party is the touchstone for the denial of an amendment.") (internal citation and quotation marks omitted).

[103] *Aerocrine AB v. Apieron, Inc.*, C.A. No. 08-787-LPS, 2010 WL 1225090, at *7 (D. Del. Mar. 30, 2010) (quoting *Clark v. Williams*, C.A. No. 07-239-JJF, 2008 WL 1803648, at *1 (D. Del. Apr. 18, 2008)).

[104] *ICU Med., Inc. v. RyMed Techs., Inc.*, 674 F. Supp. 2d 574, 578 (D. Del. 2009).

[105] *Cordance Corp. v. Amazon.com, Inc.*, 255 F.R.D. 366, 373 (D. Del. 2009).

[106] D.I. 85 at 14.

suit), plaintiff's Initial Disclosures identify Dinwoodie as plaintiff's former employee with discoverable information, and that Dinwoodie should be contacted through its counsel of record in this case.[107]

Also, the schedule in the case is currently in flux and, therefore, granting defendant's motions would not affect any of the court's current deadlines.  Furthermore, "because inequitable conduct is a matter tried to the court rather than the jury, case dispositive motions are generally not allowed by this judge on such issues no matter when they are plead."[108]

### D.     Futility

Finally, defendant maintains its proposed amendment is not futile because its proposed amendment adding inequitable conduct counterclaims satisfies the pleading requirements of Federal Rule of Civil Procedure 9(b).[109]  "In assessing 'futility,' the District Court applies the same standard of legal sufficiency as applies under Rule 12(b)(6)."[110]  "Under Rule 12(b)(6), the court does not and cannot weigh the facts, nor determine whether a party will ultimately prevail."[111]  "'Only where it is clear to the court . . . that a claim has *no* possibility of succeeding on the merits, will the court disallow it by denying leave to amend.'"[112]

Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances

---

[107] *Id.*; D.I. 85 at Ex. C.
[108] *Cordance Corp.*, 255 F.R.D. at 373.
[109] D.I. 85 at 15.
[110] *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000).
[111] *Roquette Freres*, 2009 WL 1444835, at *3 (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).
[112] *Id.* (omission and emphasis in original) (quoting *Agere Sys. Guardian Corp. v. Proxim, Inc.*, 190 F. Supp. 2d 726, 736 (D. Del. 2002)).

constituting fraud or mistake shall be stated with particularity."[113]  "[I]n pleading

inequitable conduct in patent cases, Rule 9(b) requires identification of the specific who,

what, when, where, and how of the material misrepresentation or omission committed

before the PTO."[114]  To adequately plead inequitable conduct under Rule 9(b), a

pleading "must include sufficient allegations of underlying facts from which a court may

reasonably infer that a specific individual (1) knew of the withheld material information

or the falsity of the material misrepresentation, and (2) withheld or misrepresented this

information with a specific intent to deceive the PTO."[115]

   "[A]s general matter, the *materiality* required to establish inequitable conduct is

but-for materiality."[116]  "[P]rior art is but-for material if the PTO would not have allowed a

claim had it been aware of the undisclosed prior art."[117]  "Although but-for materiality

generally must be proved to satisfy the materiality prong of inequitable conduct, this

court recognizes an exception in cases of affirmative egregious misconduct. . . . .  When

the patentee has engaged in affirmative acts of egregious misconduct, such as the filing

of an unmistakably false affidavit, the misconduct is material."[118]

   "[A] inference of deceptive intent must be reasonable and drawn from a

pleading's allegations of the underlying fact to satisfy Rule 9(b)."[119]  That inference does

---

[113] FED. R. CIV. P. 9(b).
[114] *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1327 (Fed. Cir. 2009).
[115] *Id.* at 1328-29.
[116] *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1291 (Fed. Cir. 2011) (en banc) (emphasis added).
[117] *Id.*
[118] *Id.* at 1291.
[119] *Exergen*, 575 F.3d at 1329 n.5.  "A reasonable inference is one that is plausible and that flows logically from the facts alleged, including any objective indications of candor and good faith."  *Id.* (citation omitted).

not have to be "the *single most reasonable inference* able to be drawn from the evidence to meet the clear and convincing standard" used to prove an inequitable conduct claim on the merits.[120]  Deceptive intent may be plead on "'information and belief' . . . under Rule 9(b) when essential information lies uniquely within another party's control, but only if the pleading sets forth the specific facts upon which the belief is reasonably based."[121]

Defendant contends its proposed amendment meets these requirements by:  (1) sufficiently pleading the specific who, what, when, where, and how of the material misrepresentation or omission committed before the PTO; (2) alleging sufficient facts from which the court can reasonably infer the Dinwoodie knew the withheld information was material; and (3) setting forth sufficient facts from which the court may reasonably draw the inference of deceptive intent.[122]

With regard to the '788 patent, defendant states its proposed amendment specifically identifies Dinwoodie as the individual "who" knew the information about the prior art, knew its was highly material, and deliberately withheld it.[123]  The proposed amendment identifies "what" claims and limitations the prior art relates to, all the asserted claims of the '788 patent, and specifically the "means for regulating

---

[120] *Id.* (emphasis in original); *see also Wyeth Holdings Corp. v. Sandoz, Inc.*, C.A. No. 09-955-LPS-CJB, 2012 WL 600715, at *6-9 (D. Del. Feb. 3, 2012) (explaining that the "reasonable inference" recited in *Exergen* applies, and not *Therasense's* "single most reasonable inference," at the pleading stage); *EMC Corp. v. Pure Storage, Inc.*, C.A. No. 13-1985(RGA), 2014WL 5795557, at *1 n.1 (D. Del. Nov. 5, 2014) (agreeing with the *Wyeth* court).

[121] *Exergen*, 575 F.3d at 1330.

[122] D.I. 85 at 15-20.

[123] D.I. 85, Ex. A at ¶¶ 57-83.

19

temperature" limitation of those claims that Dinwoodie argued to be absent from the prior art.[124]  The proposed amendment identifies "where" in the references the material information is found, for example, by quoting and paraphrasing portions of the references, incorporating defendant's invalidity contentions, and identifying excerpts of the references in Dinwoodie's inventor notebooks.[125]  It also identifies "how" the examiner would have used the omitted information, by finding the asserted claims of the '788 patent invalid as anticipated in view of each of the references, as the "means for temperature regulation" (the only element the examiner found to be missing from the prior art) was present in each reference.[126]

With regard to the '988 patent, defendant states the proposed amendment specifically identifies Dinwoodie as the individual "who" both knew of the prior art, knew that the information was material, and deliberately withheld it.[127]  The proposed amendment identifies "what" claims and limitations the prior art references relate to.[128] It states the prior art would have rendered all asserted claims invalid and specifically identifies that the prior art includes the very "access openings" limitations that Dinwoodie argued to be absent from the prior art being considered by the examiner.[129] The proposed amendment identifies "when" the omission(s) were made before the PTO–when the application that led to the '839 patent was filed and also during the

---

[124] *Id.*, Ex. A at ¶¶ 59, 65, 74-76, 81-83.
[125] *Id.*, Ex. A at ¶¶ 60-62, 65-68, 73, 75-77, 81-82.
[126] *Id.*, Ex. A at ¶¶ 59, 65, 74-76, 81-83.
[127] *Id.*, Ex. A at ¶¶ 102-05.
[128] *Id.*, Ex. A at ¶¶ 105-06.
[129] *Id.*, Ex. A at ¶¶ 105-06.

prosecution of the Reissue Application.[130]  The proposed amendment identifies "where" in the references the material information is found by, for example, citing to particular examples of "access openings" that are present in the prior art and incorporating defendant's invalidity contentions which identify where all limitations are found in the withheld prior art.[131]  It also identifies "how" the examiner would have used the omitted information, by finding the '839/'988 patent invalid as anticipated or obvious in view of the omitted prior art.[132]

### 1.     Inequitable Conduct in the Motion to Amend

### i.     Woodring and the '592 patent

Prior to prosecuting the '592 patent, Dinwoodie obtained a copy of U.S. Patent No. 4,886,554 ("the '554 patent") to Woodring, titled Solar Roofing Assembly, and he copied portions of the specification, the figures, and even the claims, from Woodring into the application that led to his '592 patent.[133]

Initially, the examiner rejected all claims of the '592 patent as anticipated by Woodring.[134]  In response, Dinwoodie argued "the present invention, as claimed, distinguishes over Woodring et al. by combining the functions of photovoltaic module and paver, which is not the same as combining the functions of the insulation block and paver."[135]  He also stated "claim 1 now clearly establishes that the function of the paver and photovoltaic modules are combined" and that "no known . . . inventions suggested

---

[130] *Id.*, Ex. A at ¶¶ 102-04, 110-11, 116, 121-22.
[131] *Id.*, Ex. A at ¶¶ 104-06.
[132] *Id.*, Ex. A at ¶¶ 104-06.
[133] *Id.*, Ex. A at ¶¶ 47-49.
[134] *Id.*, Ex. A at ¶ 50.
[135] *Id.*, Ex. A at ¶ 50.

by the prior arts contemplate the use of photovoltaic modules as self-ballast."[136]

Defendant alleges that contrary to Dinwoodie's representation, Woodring does contemplate the use of photovoltaic modules as self-ballast.[137] In particular, at column 1, lines 37-38 the Woodring patent states "the photovoltaic cells can be of such a construction that they can also serve as pavers."[138] Nevertheless, following Dinwoodie's argument concerning the teachings of the Woodring patent, the examiner allowed the claims of the '592 patent to issue.[139]

Defendant alleges that based on Dinwoodie's familiarity with the Woodring patent, he knew his statement was false when he made it to the examiner and he made the statement with the intent to deceive the examiner into allowing the pending claims of the '592 patent.[140] According to defendant, but for Dinwoodie's knowing misrepresentation concerning the teachings of the prior art, those claims would not have issued.[141]

Less than a month after the '592 patent issued, Dinwoodie filed the '499 application that gave rise to the '788 patent.[142] During the prosecution of the '499 application, the examiner rejected all pending claims as *prima facie* obvious over Dinwoodie's '592 patent in combination with other prior art that disclosed the need for thermal regulation of solar cell arrays and the regulation of the temperature of solar

---

[136] *Id.*, Ex. A at ¶ 50.
[137] *Id.*, Ex. A at ¶ 51.
[138] *Id.*, Ex. A at ¶ 51.
[139] *Id.*, Ex. A at ¶ 51.
[140] *Id.*, Ex. A at ¶ 52.
[141] *Id.*, Ex. A at ¶ 52.
[142] *Id.*, Ex. A at ¶ 53.

panels through both (1) convective cooling; and (2) use of a phase change material.[143] The examiner's rejection was based on the doctrine of obviousness type double patenting.[144] Dinwoodie was forced to file a terminal disclaimer to overcome the rejection.[145]

Defendant alleges that but for Dinwoodie's inequitable conduct in obtaining the '592 patent, the claims of the '499 application, which gave rise to the '788 patent-in-suit, would have been rejected over the Woodring patent and the other prior art cited by the examiner.[146]  Had the claims been rejected over those references, Dinwoodie would not have been able to overcome the rejection by filing a terminal disclaimer, and the '499 application would never had matured into the asserted '788 patent.[147]

The court finds defendant's proposed amendment does not adequately plead inequitable conduct with respect to the Woodring patent and the prosecution of the '592 patent.  "[P]rior art is but-for material if the PTO would not have allowed a claim had it been aware of the undisclosed prior art."[148]  The examiner was aware of the Woodring patent and, indeed, initially rejected the pending claims based upon that reference.  The examiner had the expertise to examine the prior art reference and consider Dinwoodie's argument against the rejection.[149]  Therefore, the court denies defendant's motion with

---

[143] *Id.*, Ex. A at ¶ 54.
[144] *Id.*, Ex. A at ¶ 54.
[145] *Id.*, Ex. A at ¶ 54.
[146] *Id.*, Ex. A at ¶ 55.
[147] *Id.*, Ex. A at ¶ 55.
[148] *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1291 (Fed. Cir. 2011).
[149] *See, e.g. Young v. Lumis, Inc.*, 492 F.3d 1336, 1349 (Fed. Cir. 2007) ("The examiner had the [prior art reference] to refer to during the reexamination proceeding and initially rejected claim 1 based on that reference.  [The applicant] argued against

respect to its allegations concerning the Woodring patent and the prosecution of the '592 patent.

### ii.      Withheld Prior Art

With respect to the '788 patent, defendant contends Dinwoodie's withholding of certain prior art products, publications, and an installations of photovoltaic assemblies that included an air gap between the backside of the module and the surface of the roof and allowed for convective cooling of the photovoltaic modules from the PTO constituted inequitable conduct.[150]   During prosecution of the '788 application, Dinwoodie argued the claims were patentable because "none of the prior art 'shows a photovoltaic roofing assembly which have (sic) features which enable is (sic) to limit temperatures experienced by the photovoltaic modules.'"[151]   He made this argument despite allegedly knowing that all of the withheld prior art included an air gap between the backside of the module and the surface of the roof (the "means for regulating temperature" described in the '788 patent).[152]   Defendant alleges the withheld information would have been highly material to the prosecution of the '788 patent as these references, if disclosed, would have invalidated the claims.[153]   Defendant alleges

───────────────────

the rejection, and the examiner was free to reach his own conclusions and accept or reject [the applicant's] arguments.  We therefore fail to see how the statements in the [applicant's response], which consist of attorney argument and an interpretation of what the prior art discloses, constitute affirmative misrepresentations of material fact."); *Rothman v. Target Corp.*, 556 F.3d 1310, 1329-29 (Fed. Cir. 2009) ("While the law prohibits genuine misrepresentations of material fact, a prosecuting attorney is free to present argument in favor of patentability without fear of committing inequitable conduct.").

[150] D.I. 85 at 5.
[151] *Id.*, Ex. A at ¶ 78.
[152] *Id.*, Ex. A at ¶¶ 59, 65, 75, 83.
[153] *Id.*, Ex. A at ¶¶ 61, 68, 77, 82.

Dinwoodie withheld the foregoing information with the improper intent to deceive the PTO.[154]

On April 8, 1996, Dinwoodie filed the '052 application, entitled "Lightweight, Self-Ballasting Photovoltaic Roofing Assembly" which issued as the '839 patent on May 5, 1998.[155]  The '839 patent reissued as the '988 patent on February 28, 2006.[156] Defendant alleges during the prosecution of the '839 patent application, Dinwoodie failed to disclose the same prior art raised in its '788 patent allegations, with the exception of the Fuentes reference, each of which was highly material to the patentability claims of the '839 patent.[157]  On January 23, 1997, the examiner issued an office action rejecting all of the claims of the '052 application as unpatentable over Dinwoodie's '582 patent in view of U.S. Patent No. 5,524,401 ("the '401 patent").[158]  To overcome the rejection, the applicant argued "[t]he invention of claim 1 is neither shown in nor made obvious by the cited art because the photovoltaic modules [in the prior art] do not include access openings extending along at least two sides of the photovoltaic module."[159]  Defendant alleges the withheld prior art was but-for material because each of the withheld references includes the access openings the applicant argued were missing from the prior art.[160]  Defendant alleges, at the time applicant made the above argument concerning "the cited art," Dinwoodie knew the prior art alleged in this case

---

[154] *Id.*, Ex. A at ¶¶ 62, 69, 78, 83.
[155] *Id.*, Ex. A at ¶ 100.
[156] *Id.*, Ex. A at ¶ 100.
[157] *Id.*, Ex. A at ¶ 102.
[158] *Id.*, Ex. A at ¶ 104.
[159] *Id.*, Ex. A at ¶ 104.
[160] *Id.*, Ex. A at ¶ 104.

included "access openings extending along at least two sides of the photovoltaic module" and, therefore, was material and yet he failed to disclose that prior art to the PTO.[161]  Defendant alleges Dinwoodie withheld the but-for material prior art with the intent to deceive the PTO during the prosecution of the '988 patent.[162]

Plaintiff argues defendant's motion to amend is futile and deficient under Rule 9(b) because it does not allege facts from which the court may reasonably infer Dinwoodie withheld or misrepresented material information with a specific intent to the deceive the PTO.[163]  Plaintiff maintains defendant's pleading of deceptive intent based solely on "information and belief" and the alleged materiality of the references is legally insufficient.[164]  As noted above, deceptive intent may be pled on "information and belief" if the specific facts upon which the belief is reasonably based are pled.[165]  Defendant maintains it has adequately pled those specific facts.[166]

### a.   SOFREL

Defendant alleges Dinwoodie did not disclose WIPO Pub. No. W094/00650 to Peter Toggweiler, et al., dated January 6, 1994 and an article titled "Development of a Flat Roof Integrated Photovoltaic System (SOFREL®)," dated March 1994.[167]

---

[161] *Id*, Ex. A at ¶ 105.
[162] *Id.*, Ex. A at ¶ 106.
[163] D.I. 94 at 14.
[164] *Id.* at 14-15.
[165] *Exergen*, 575 F.3d at 1330.
[166] D.I. 85 at 19-20 (citing *id.*, Ex. A at ¶¶ 62, 69, 78, 83, 98, 106) (with respect to the '788 patent); D.I. 85 at 20 (citing *id.*, Ex. A at ¶¶ 104-106) (with respect to the '988 patent)).
[167] *Id.*, Ex. A at ¶¶ 59-62, 102-03.  Toggweiler developed an integrated lightweight roof photovoltaic system known as the "Solar Flat Roof Element" or "SOFREL."  *Id.*, Ex. A at ¶ 57.  Toggweiler's SOFREL product was described in international patent publication WIPO Pub. No. W094/00650.  *Id.*, Ex. A at ¶ 59.

Plaintiff maintains defendant does not allege Dinwoodie actually knew of SOFREL, let alone any specific prior art reference disclosing it.[168]  Plaintiff also contends no facts are alleged that Dinwoodie knew of a SOFREL patent publication and a "report" raised by defendant.[169]  Plaintiff argues defendant has not shown that the SOFREL "report" of March 1994 was a prior at publication under § 102 as the report bears no indicia of having been published at that time.[170]

To the contrary, defendant's proposed amendment alleges "Dinwoodie knew of the SOFREL Patent and the SOFREL Report," he "knew the SOFREL Patent and the SOFREL Report were material and he withheld the SOFREL Patent and the SOFREL Report with the improper intent to deceive the PTO."[171]  In support of those allegations, the proposed amendment alleges:  (1) Dinwoodie met with the inventor of SOFREL no later than December 1994 and with whom he communicated thereafter concerning his SOFREL system; (2) Dinwoodie attended at least one conference where the inventor presented a paper on SOFREL; (3) Dinwoodie's journal from 1995 includes several references to the inventor, including on what appears to be a list of phone calls for Dinwoodie to make; (4) despite knowing about the SOFREL Patent and the SOFREL Report, Dinwoodie did not inform the PTO about those references; (5) Dinwoodie cited other prior art references during the prosecution of the '788 patent that were less similar to the invention claimed in the '788 patent than the SOFREL prior art and distinguished the claims he was prosecuting by alleging they included a point of novelty (convective

---

[168] D.I. 94 at 15.
[169] *Id.*
[170] *Id.* at 16 n.3.
[171] D.I. 85, Ex. A at ¶¶ 60-62.

cooling) that Dinwoodie knew to be present in the withheld SOFREL prior art.[172]

The court determines defendant's proposed amendment is not futile as it adequately pleads knowledge of the SOFREL prior art and the facts supporting an inference of that knowledge and an intent to deceive the PTO by withholding that material information.[173]

### b.   Ascension Roof Jacks

Defendant alleges Dinwoodie did not disclose the article titled "PV Array Designs for Flat-Roof Buildings," by Edward Kern and Miles Russell, dated May 1993 and did not disclose the installation of Ascension Technologies Roof-Jacks assemblies in 1992 and 1993 as disclosed in the Kern and Russell article.[174]

According to plaintiff, defendant alleges Dinwoodie knew of an Ascension Roof-Jacks "assembly," but the counterclaims then morph into a discussion of two publications concerning the Roof-Jacks system (the Kern papers).[175]   Plaintiff contends defendant is silent on facts which allow an inference that Dinwoodie had any knowledge of those publications.[176]

Plaintiff states SunLink asked Dinwoodie if he recalled either of the Kern papers, and he said he did not.[177]   Plaintiff accuses defendant of speculating, against the evidence of record, that because Dinwoodie attended the same conference as "Kern

---

[172] *Id.*, Ex. A at ¶¶ 57-62; *see also id.*, Ex. A at ¶ 106.
[173] The court also finds establishing whether the SOFREL Report was a prior art publication under § 102 is not relevant at the pleading stage.
[174] D.I. 85, Ex. A at ¶¶ 65-69, 102-03.
[175] D.I. 94 at 16.
[176] *Id.*
[177] *Id.*

and others" in 1994, he must have received and reviewed the paper that "Kern and others" presented.[178]  Plaintiff concludes defendants allegations are unfounded and fail to satisfy the pleading standard in *Exergen*.[179]  Plaintiff also notes the Roof-Jacks prior art was before the PTO during the IPR of both the '788 and '988 patents and the Board did not find it to be material to the patentability of either patent, findings that are directly contrary to defendant's allegations.[180]

Plaintiff's argument with respect to Dinwoodie's recollection of the Kern papers and the determination of the Board with respect to the Roof-Jacks prior art go to the merits of defendant's allegations, a determination the court may not make at the pleading stage.[181]

Defendant's proposed amendment alleges "Dinwoodie knew Roof Jacks, the paper titled 'PV Arrays for Flat-Roof Buildings,' and the assemblies identified therein were material and he withheld them with the improper intent of deceiving the PTO."[182]  Defendant proposed amendment pleads the following facts in support of its contention that Dinwoodie knew of the Roof-Jacks prior art and withheld it with the intent to deceive:  (1) Dinwoodie attended a conference where the inventors of Roof-Jacks presented one of the prior art publications; (2) that the inventors presented the other publication at a prior conference of the IEEE; (3) Dinwoodie identified Roof-Jacks in a

---

[178] *Id.*

[179] *Id.*

[180] *Id.* (citing D.I. 71, Ex. C at 16-19; D.I. 74-1, Ex. 1 at 14-17).

[181] *Roquette Freres v. SPI Pharma, Inc.*, C.A. No. 06-540-GMS, 2009 WL 1444835, at *3 (D. Del. May 21, 2009) ("Under Rule 12(b)(6), the court does not and cannot weigh the facts, nor determine whether a party will ultimately prevail.") (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

[182] D.I. 85, Ex. A at ¶ 69.

1993 federal grant application as an existing product in the market that the PowerGuard product would be entering, describing Roof-Jacks in that application in a manner consistent with how the product is described in the publications; (4) despite his knowledge of the Roof-Jacks prior art, Dinwoodie did not disclose information regarding that prior art during the prosecution of the '788 patent; (5) Dinwoodie knew Roof-Jacks was highly material as he described it in his own December 1993 grant application; and (6) he cited other prior art references that were less similar to his invention than Roof-Jacks, and distinguished the claims he was prosecuting by alleging the claimed invention included a point of novelty (convective cooling) that he knew to be present in the withheld Roof-Jacks prior art.[183]

With respect to the '788 patent, the court determines defendant's proposed amendment is not futile as it adequately pleads knowledge of the Roof-Jacks prior art and the facts supporting an inference of that knowledge and an intent to deceive the PTO by withholding that material information.

Defendant also alleges "Dinwoodie installed an Ascension Roof Jacks system in August of 1996 on the roof of the Engineering Building on the University of Wyoming campus" and that Dinwoodie identified Roof-Jacks as an existing product."[184]  Plaintiff points out Dinwoodie disclosed that installation to the PTO during the prosecution of the '839 patent.[185]  In its reply brief, defendant does not dispute, or address, Dinwoodie's disclosure of that Roof-Jacks installation to the PTO.  Because of that disclosure, there

---

[183] *Id.*, Ex. A at ¶¶ 64-69.
[184] D.I. 94 at 16 (citing D.I. 85, Ex. [A] at ¶ 67).
[185] *Id.* (citing D.I. 95, Ex. G at SUNP 0000625-30).

was no reason for Dinwoodie to disclose additional information concerning the Roof-

Jacks prior art and, therefore, defendant's motion to amend is denied as to its

allegations with respect to the '988 patent regarding that prior art.[186]

### c.   Fuentes

Defendant alleges Dinwoodie did not disclose a 1987 article by Martin K. Fuentes

titled "A Simplified Thermal Model for Flat-Plate Photovoltaic Arrays."[187]

Plaintiff states defendant makes only a bare assertion that Dinwoodie knew of

the Fuentes article and does not make any specific allegations to show Dinwoodie knew

of the article and made a deliberate decision to withhold the Fuentes reference from the

examiner.[188]

Defendant's proposed amendment alleges "before the application that led to the

'788 patent was filed, Mr. Dinwoodie knew of an article titled 'A Simplified Thermal

Model for Flat-Plate Photovoltaic Arrays' by Martin K. Fuentes" and that he "knew

Fuentes was material and he withheld Fuentes with the improper intent of deceiving the

PTO."[189]  Defendant proposed amendment pleads the following facts in support of those

allegations:  (1) Dinwoodie's lab notebook entries show he knew of the Fuentes article

no later than May 24, 1994, prior to the application that let to the '788 patent was filed;

(2) his lab notebook includes a "Heat Loss Model" that copies certain teachings of the

---

[186] *Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565, 1582 (Fed. Cir. 1991) ("When a reference was before the examiner, whether through the examiner's search or the applicant's disclosure, it cannot be deemed to have been withheld from the examiner.") *overruled on other grounds by Abbots Labs. v. Sandoz, Inc.*, 566 F.3d 1282 (Fed. Cir. 2009).
[187] D.I. 85, Ex. A at ¶¶ 71-78.
[188] D.I. 94 at 17.
[189] D.I. 85, Ex. A at ¶¶ 71, 78.

Fuentes article and identifies the paper by name, including the statement "From Fuentes"; (3) notes from Dinwoodie's inventor notebook reflect that he incorporated the teachings of the Fuentes article into his calculations related to the temperature regulation of photovoltaic modules, e.g., his notebook copies Fuentes's teaching that photovoltaic panels installed with "standoff mounts" have installed operating temperatures that are -1°C to 11°C higher than nominal operating temperatures, versus 17°C to 20°C higher when mounted directly to the mounting surface; (4) the specification of the '788 patent includes the same conclusions Dinwoodie drew from the Fuentes paper; (5) despite his knowledge of the Fuentes article, Dinwoodie never informed the PTO during the prosecution of the '788 patent about this prior art, even though he knew the article was material as he reviewed it in detail and cited and quoted it in his inventor notebook; (6) Dinwoodie argued during the prosecution of the '788 patent that none of the prior art "shows a photovoltaic roofing assembly which have (sic) features which enable is (sic) to limit temperatures experienced by the photovoltaic modules" despite knowing Fuentes taught limiting temperatures using "standoff mounts"; and (7) Dinwoodie cited other prior art references that were less similar to his invention than the assemblies described in Fuentes, and he distinguished the claims he was prosecuting by alleging the claimed invention included a point of novelty (convective cooling) that he knew to be present in the withheld prior art.[190]

The court determines defendant's proposed amendment is not futile as it adequately pleads knowledge of the Fuentes prior art and the facts supporting an

---

[190] *Id.*, Ex. A at ¶¶ 72-78.

inference of that knowledge and an intent to deceive the PTO by withholding that material information.

### d.    Stafford

Defendant alleges Dinwoodie did not disclose and a 1993 paper titled "Design Considerations and Performance of Maspeth a-Si PV System" by Byron Stafford, including a PV assembly in Maspeth, New York described therein.[191]

Plaintiff again contends defendant makes only a bare assertion of Dinwoodie's knowledge of this article with a reference to certain temperature calculations in Dinwoodie's lab notebook, but does not identify where in Dinwoodie's various notebooks the calculations can be found, or where they are located in the article.[192]  Plaintiff concludes, therefore, defendant failed to allege facts giving rise to materiality and a plausible inference of specific intent to deceive.[193]

Defendant's proposed amendment alleges that while the application that lead to the '788 patent was pending, Dinwoodie knew the Stafford paper, and the Maspeth assembly described therein, were material, and he withheld them with the improper intent of deceiving the PTO.[194]  In support of its contention that Dinwoodie knew of the Stafford paper, defendant's proposed amendment alleges that entries in a lab notebook of Dinwoodie indicates he knew of the Stafford paper and the Maspeth assembly during the prosecution of the application that led to the '788 patent and includes temperature

---

[191] *Id.*, Ex. A at ¶¶ 80-83, 102-03.
[192] D.I. 94 at 17.
[193] *Id.*
[194] D.I. 85, Ex. A at ¶¶ 80, 83.

calculations that appear to be derived from the Stafford paper.[195]

Defendant's allegation that Dinwoodie's knowledge of the Stafford paper was *indicated* by temperature calculations that *appear to be derived* from the Stafford paper is not sufficient to raise a reasonable inference that Dinwoodie knew of this reference which he then failed to disclose with the intent to deceive the PTO and, therefore, defendant's motion is denied with respect to the Stafford paper.

### iii.   Allegations of Misconduct before the PTO during the Prosecution of the '839 and '988 Patents

Defendant's proposed amendment alleges Dinwoodie, or Dinwoodie and his attorney, filed several false declarations during the prosecution of the '839 and '988 patents:  Dinwoodie filed a false declaration as to the reason for seeking reissue of the '839 patent;[196] Dinwoodie and his attorney submitted false declarations during prosecution of the '839 and '988 patents regarding Dinwoodie's PowerGuard product;[197] and Dinwoodie submitted false and misleading declarations in the Reissue Application regarding his "special knowledge" in the area of wind uplift.[198]  "When the patentee has engaged in affirmative acts of egregious misconduct, such as the filing of an *unmistakably false affidavit*, the misconduct is material."[199]

### iv.   Stated Reason for Seeking Reissue of the '839 Patent

On April 15, 2003, Dinwoodie filed Reissue Patent Application No 10/414,347

---

[195] *Id.*, Ex. A at ¶ 81.
[196] *Id.*, Ex. A at ¶¶ 109-17.
[197] *Id.*, Ex. A at ¶¶ 119-22.
[198] *Id.*, Ex. A at ¶¶ 123-28.
[199] *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1292 (Fed. Cir. 2011) (emphasis added).

seeking reissue of the '839 patent ("the Reissue Application").[200]  Defendant's proposed

amendment alleges that in connection with the Reissue Application, Dinwoodie stated

under oath that reissue was necessary because:

> I verily believe the original ['839 Patent] is partially inoperative or partially
> invalid by reason of having claimed more than I had a right to claim in the
> patent.  At least one error in the original patent, which is corrected in the
> present reissue application, is found in the element of Claim 31 which
> recites 'having access openings that are between 5% and 50% of the
> length of at least two sides of each photovoltaic module...'  The use of 'at
> least two sides' in this element of claim 31 is too broad and is being
> replaced by 'each of the first, second, third and fourth sides.'[201]

Dinwoodie further declared that "[a]ll errors corrected in the patent reissue application

arose without deceptive intent on my part as applicant.[202]

Defendant alleges Dinwoodie's declaration was false because the actual reason

he sought reissue of the '839 patent was to disclose certain prior art he had previously

withheld during prosecution of the original application that led to the '839 patent.[203]  This

was not a proper basis for seeking reissue and, through his declaration, Dinwoodie

allegedly intentionally misled the examiner into believing the purpose of the reissue was

to correct one or more mistakes in the original claims.[204]

On April 15, 2003, the applicant filed an IDS in the Reissue Application that

included an article by Dinwoodie titled "Optimizing Roof-Integrated Photovoltaics:  A

Case Study of the PowerGuard[TM] Roofing Tile" and four drawing sheets of the

PowerGuard product as it was installed on a building in Folsom, California in September

---

[200] D.I. 85, Ex. A at ¶ 109.
[201] *Id.*, Ex. A at ¶ 110.
[202] D.I. 95, Ex. G at SUNP 0000032.
[203] D.I. 85, Ex. A at ¶ 111.
[204] *Id.*, Ex. A at ¶ 111.

1994.[205]  On February 12, 2004, the examiner rejected claims 1-6, 13, 17-26, 30-33, 35, 55, 56, 58, 61, 62, 71-75, 78, and 79 as anticipated by the Dinwoodie article and the accompanying drawing sheets.[206]

On March 28, 2004, the applicant submitted a draft first amendment in which he described the "two basic aspect of the invention being claimed" (as reflected in how the claims were being amended) as follows:

> The first is directed to a photovoltaic assembly without an insulation block/layer.  This type of assembly is claimed in, for example, independent claims 1, 55, 56 and 80.  The second is claimed in independent claim 31.  This type of assembly is also found in SunPower's PowerGuard solar electric roof system . . . which has a flat PV module mounted over a polystyrene insulation board by spacers.[207]

Defendant alleges both of these categories of amendments enabled the applicant to avoid the Dinwoodie prior art that was submitted with the Reissue Application.[208] Claims 1, 55, 56, and 80 specified the open region on the backside of the PV module is in "direct contact" with the building rooftop, i.e., there can be no insulation layer.[209]  The applicant argued that this distinguished the claims over the prior art because the Dinwoodie article did not suggest it would be possible to remove the insulation layer from the prior art PowerGuard product.[210]  Independent claim 31 was amended to require access openings of 5% to 50% along "each of the first, second, third and fourth sides of the PV module."[211]  The applicant argued this amendment rendered the claim

---

[205] *Id.*, Ex. A at ¶ 112.
[206] *Id.*, Ex. A at ¶ 113.
[207] *Id.*, Ex. A at ¶ 114.
[208] *Id.*, Ex. A at ¶ 115.
[209] *Id.*, Ex. A at ¶ 115.
[210] *Id.*, Ex. A at ¶ 115.
[211] *Id.*, Ex. A at ¶ 115.

patentable over the prior art because "[e]ven if it were assumed, for sake of discussion, that the DOE/WAPA Prototype has spacers along four sides (because of the ends of the four parallel spacers), the DOE/WAPA Prototype still does not have 'openings that are between 5% and 50% of the length of each of the first, second, third and fourth sides of each photovoltaic module' as presently claimed."[212]

Defendant alleges, therefore, that independent claims 1, 31, 55, 56, and 80 were all presented/amended to avoid prior art Dinwoodie had withheld from the examiner, not to correct an innocent mistake in the claim language, as Dinwoodie represented in his declaration.[213]

The court determines defendant's allegations do not adequately state a claim for inequitable conduct.  Defendant makes the conclusory allegation that the "real reason" Dinwoodie filed the Reissue Application was not for the stated reason that claim 31 was to be amended to recite openings that are between 5% and 50% of the length of at least each of the first, second, third and fourth sides of each photovoltaic module," but to present prior art previously withheld during the prosecution of the '839 patent.  That amendment was made to claim 31; defendant even includes that fact in its proposed amendment.[214]  As to claims 1, 55, 56, and 80, Dinwoodie amended those claims to overcome their rejection in light of the prior art he submitted with his IDS.  Defendant's allegations do not plausibly plead a specific intent to deceive the PTO with regard to Dinwoodie's "real reason" for filing the Reissue Application and its motion is denied with

---

[212] *Id.*, Ex. A at ¶ 115.
[213] *Id.*, Ex. A at ¶ 116.
[214] *Id.*, Ex. A at ¶ 115.

respect to those allegations.

### v.   Misrepresentations during Prosecution of the '839 and '988 Patents Regarding Dinwoodie's PowerGuard Product

Defendant's proposed amendment alleges Dinwoodie made false and misleading arguments during the prosecution of the '839 patent and when prosecuting the Reissue Application.[215]

Defendant alleges that during prosecution of the '839 patent, to overcome a rejection of all pending claims as obvious over Dinwoodie's earlier '592 patent, Dinwoodie submitted declarations and exhibits that touted the benefits and commercial success of his PowerGuard product.[216]  Among these materials were data and declarations related to certain wind tunnel testing to which the PowerGuard product had been subjected.[217]  Then, in the Reissue Application, the applicant argued and submitted a declaration from Dinwoodie to show that certain claims being prosecuted were not obvious over PowerGuard because they lacked the insulation layer that PowerGuard required.[218]

Defendant alleges, therefore, that during prosecution of the '839 patent, Dinwoodie and his attorney represented to the examiner that all pending claims were not obvious because the product those claims covered (PowerGuard) was commercially successful and included unique features.[219]  Then, when prosecuting the Reissue Application, Dinwoodie and his attorney argued that certain of those same claims were

---

[215] *Id.*, Ex. A at ¶ 118.
[216] *Id.*, Ex. A at ¶ 119.
[217] *Id.*, Ex. A at ¶ 119.
[218] *Id.*, Ex. A at ¶ 119.
[219] *Id.*, Ex. A at ¶ 120.

not covered or even obvious over PowerGuard because "the successful performance of a product with insulation block as base (such as PowerGuard) does not foretell the success of a product which does not use an insulation block as base."[220]   Defendant alleges, in this manner, Dinwoodie and his attorney knowingly mislead the examiner into allowing the claims that did not recite an insulation layer.[221]

Defendant also alleges that during prosecution of the '839 patent, the applicant argued that claim 1 (which does not recite an insulation layer)  was allowable because the prior art did not include photovoltaic modules with spacers extending along at least two sides of the module.[222]   When the applicant made that argument, Dinwoodie was withholding the PowerGuard prior art that he later submitted with the Reissue Application, which discloses the very element the applicant argued to be missing (access openings along at least two sides of the module).[223]   According to defendant, as evidenced by the examiner's rejection of the pending claims over the PowerGuard prior art in the Reissue Application, had the PowerGuard prior art been submitted when the application that led to the '839 patent was pending, claim 1 would have been rejected and Dinwoodie and his attorney would not have been able to overcome the rejection with the inconsistent argument they later presented.[224]

Defendant alleges the PowerGuard prior art was material to the claims of the '839 patent, Dinwoodie knew it was material during the prosecution of the '839 patent,

---

[220] *Id.*, Ex. A at ¶ 120.
[221] *Id.*, Ex. A at ¶ 120.
[222] *Id.*, Ex. A at ¶ 121.
[223] *Id.*, Ex. A at ¶ 121.
[224] *Id.*, Ex. A at ¶ 121.

and he made a conscious decision to withhold it from the examiner.[225]   Defendant alleges Dinwoodie and his attorney intentionally mislead the examiner by arguing and submitting declarations that all claims were covered by PowerGuard, and then later arguing and submitting declarations that certain of those *same claims* were not covered by or even obvious in view of PowerGuard.[226]

The court again determines defendant's allegations do not adequately state a claim for inequitable conduct.  Defendant's proposed amendment acknowledges PowerGuard was before the PTO during the original prosecution of the '839 patent and the reissue of the '988 patent.[227]  During prosecution of the '839 patent Dinwoodie submitted declarations and exhibits touting the benefits and commercial success of his PowerGuard product.[228]  In the Reissue Application, the applicant argued certain claims being prosecuted were not obvious over PowerGuard because they lacked an insulation layer.[229]  It is not clear that those claims were the same claims the applicant argued were covered by the PowerGuard product during the prosecution of the '839 patent. Defendant alleged in its proposed inequitable conduct claim regarding the "real reason" for submitting the Reissue Application that the claims directed to a photovoltaic assembly without an insulation block were amended to remove the requirement of an insulation block during the reissue proceedings and, thereby, avoid the Dinwoodie prior art.[230]

---

[225] *Id.*, Ex. A at ¶ 122.
[226] *Id.*, Ex. A at ¶ 122 (emphasis added).
[227] *Id.*, Ex. A at ¶¶ 119-20.
[228] *Id.*, Ex. A at ¶ 119.
[229] *Id.*, Ex. A at ¶ 119.
[230] *Id.*, Ex. A at ¶ 114.

The court determines, therefore, that defendant's allegations do not plausibly plead a specific intent to deceive the PTO with regard to the applicant's representations regarding the PowerGuard product during the prosecution of the '839 patent and the reissue of the '988 patent and its motion is denied with respect to those allegations.

vi.     **Misrepresentations in the Reissue Application Regarding Dinwoodie's "Special Knowledge" in the Area of Wind Uplift**

Defendant's proposed amendment alleges Dinwoodie submitted a false declaration concerning his "special knowledge" in the area of wind uplift.[231]  On April 5, 2004, Dinwoodie submitted a declaration stating "in the timeframe prior to 2000, it would have been difficult to predict the performance of a product without insulation block based on the state-of-the-art knowledge at the time within the industry and among researchers."[232]  He added, however, that he was in a "leading position to theorize the suitable performance of a product without insulation block" as early as 1994 because of his company's "extensive research into the benefits of permeability with respect to lightweight PV rooftop systems."[233]  The "specialized knowledge" he had as of 1994 "provided the basis for several claims, including the claim that issued as claim 1 of U.S. Patent No. 5,746,839."[234]  Dinwoodie also declared that wind tunnel testing conducted in 1996 and 1997 confirmed the theory he had had in 1994 concerning the suitable performance of a PV assembly without an insulation block.[235]

---

[231] *Id.*, Ex. A at ¶ 123.
[232] *Id.*, Ex. A at ¶ 124.
[233] *Id.*, Ex. A at ¶ 124.
[234] *Id.*, Ex. A at ¶ 124.
[235] *Id.*, Ex. A at ¶ 124.

In addition to his own declaration, when prosecuting the reissue application, Dinwoodie submitted the declaration of David Neff, a wind engineer affiliated with Colorado State University who was familiar with the PowerGuard product.[236] Neff's declaration stated "the ability to predict the performance of a product without insulation block was virtually non-existent in [the 1995-2000] timeframe."[237]

Dinwoodie submitted a second declaration on April 5, 2004 in which he declared that wind tunnel tests conducted in the Spring of 1995 revealed the "preferred spacer orientation with access openings between 5% and 50% of the length of the sides of the PV module."[238] The 1995 wind tunnel tests involved PV assemblies consisting of modules mounted on spacers that were, in turn, secured to an insulation layer.[239]

Defendant alleges Dinwoodie's first declaration was false and misleading because he did not possess specialized knowledge 1994 concerning the performance of a photovoltaic rooftop system without an insulation block and his company did not commission wind tunnel testing on PowerGuard until 1995 and, even then, it was a version with an insulation layer.[240] As explained in Dinwoodie's second declaration, it was not until 1996 and 1997 that he finally commissioned any wind tunnel testing of a product without and insulation layer.[241]

Defendant alleges that based on Dinwoodie's false and misleading declarations concerning his knowledge of the performance of rooftop PV assemblies without an

---

[236] *Id.*, Ex. A at ¶ 125.
[237] *Id.*, Ex. A at ¶ 125.
[238] *Id.*, Ex. A at ¶ 126.
[239] *Id.*, Ex. A at ¶ 126.
[240] *Id.*, Ex. A at ¶ 127.
[241] *Id.*, Ex. A at ¶ 128.

insulation layer in 1994, the examiner filed a Notice of Allowability for the patent on April 4, 2005 and U.S. Patent RE38,988 reissued on February 28, 2006.[242]

The court finds defendant's allegations do not support a claim of inequitable conduct.  Defendant has not identified any false statements in Dinwoodie's declarations.  Dinwoodie did not declare he had "specialized knowledge" in 1994 concerning the performance of a photovoltaic rooftop system without an insulation block; those words do not appear in Dinwoodie's declaration.[243]  In his first declaration, Dinwoodie stated that "Dr. Neff clarifies that in the timeframe prior to 2000, it would have been difficult to predict the performance of a product without insulation block based on the state-of-the-art knowledge at that time within the industry and among researchers."[244]  He then stated that "due to Powerlight's extensive research into the benefits of permeability with respect to lightweight PV rooftop systems, *around 1994* I was in a leading position *to theorize* the suitable performance of a product without insulation block."[245]  "Powerlight verified this performance in subsequent wind tunnel evaluations conducted in 1996 and 1997."[246]

Dinwoodie's second declaration regarding wind tunnel testing in the Spring of 1995 revealed the "preferred spacer orientation with access openings between 5% and 50% of the length of the sides of the PV module."[247]  That declaration does not imply

---

[242] *Id.*, Ex. A at ¶ 128.

[243] *See* D.I. 95, Ex. G at SUNP 0000199-200.

[244] *Id.*, Ex. G at SUNP 0000199.

[245] *Id.*, Ex. G at SUNP 0000199 (emphasis added).

[246] *Id.*, Ex. G at SUNP 0000199-200.  The results of the testing and expert statements were also submitted to the PTO.  D.I. 95, Ex. G at SUNP 0000201-30.

[247] *Id.*, Ex. G at SUNP 0000206.

that testing was done on an assembly without and insulation block as it explicitly states:

> In the spring of 1995, Powerlight . . . contracted with Colorado State
> University (CSU) for wind tunnel testing of photovoltaic assemblies . . . of
> the type including a PV module, *a foam insulation block* and spacers
> secured between the PV module and the insulation block to create an
> open region between the PV module and insulation block.[248]

Because the court determines defendant has not identified any material false or

misleading statements in Dinwoodie's declarations submitted during the prosecution of

the '988 patent, it denies defendant's motion to amend to add a claim of inequitable

conduct based on those declarations.

### vii.   Backdating and Alteration of Lab Notebooks and Invention Disclosure Document

Defendant's proposed amendment alleges Dinwoodie altered and backdated an

Invention Disclosure document and his lab notebook to create the appearance that he

invented what is claimed in the '788 patent before he actually did.[249]

Much of plaintiff's argument concerning alteration and backdating goes to

whether defendant will ultimately prevail on this claim of inequitable conduct, rather than

whether defendant's allegations are sufficiently plead.[250]   For instance, plaintiff contends

defendant ignores evidence contradicts its allegations.

Plaintiff states it refuted similar allegations made by SunLink in the earlier

litigation because the witnesses who signed the notebooks and the Invention Disclosure

---

[248] *Id.*, Ex. G at SUNP 0000205 (emphasis added).

[249] D.I. 85, Ex. A at ¶¶ 84-98.

[250] *Roquette Freres v. SPI Pharma, Inc.*, C.A. No. 06-540-GMS, 2009 WL
1444835, at *3 (D. Del. May 21, 2009) ("Under Rule 12(b)(6), the court does not and
cannot weigh the facts, nor determine whether a party will ultimately prevail.") (citing
*Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

document all swore that there had been no forgery or backdating.[251]  Also, Dinwoodie

and a forensics expert submitted declarations refuting these allegations.[252]  Plaintiff

contends defendant ignores this contrary evidence.[253]  As support for this evidence,

plaintiff cites its own reply brief in support of its motion to strike SunLink's amended

counterclaims and declarations filed in support of that motion.[254]

Plaintiff accuses defendant of selective reliance on the expert declaration of

SunLink's expert, Speckin, and ignores contrary evidence of plaintiff's forensic expert,

Lyter.[255]  Plaintiff maintains Speckin's earlier analysis of the conception documents was

thoroughly discredited in the SunLink Case.[256]  Plaintiff again relies on its reply brief in

its motion to strike SunLink's answer to support its contention that Speckin's analysis

was thoroughly discredited.

Plaintiff's arguments require the court to weight the evidence which, again, is not

permitted at the pleading stage.[257]

Finally, plaintiff asserts Dinwoodie's alleged motive for backdating does "makes

---

[251] D.I. 94 at 21 (citing D.I. 95, Ex. C at 3).

[252] *Id.* (citing D.I. 95, Exs. J, K).

[253] *Id.*

[254] Plaintiff also states that when faced with the threat of a Rule 11 motion based on the same allegations in view of the same contrary evidence, SunLink withdrew its first amended answer.  *Id.* (citing D.I. 95, Ex. L).  Exhibit L to D.I. 95 is a stipulation stating SunLink had filed a Corrected First Amended Answer and Counterclaims and was withdrawing its First Amended Answer and Counterclaims.  That stipulation does not indicate the reasons for SunLink's actions.

[255] *Id.*

[256] *Id.* (citing D.I. 95, Ex. C at 4 & n.1).

[257] Plaintiff also criticizes defendant for not having spoken to any person who witnessed Dinwoodie's notebook and for not deposing Dinwoodie.  *Id.*  Given the short time period between production of certain documents relied upon by defendant in preparing its proposed amendment and the deadline for amending pleadings, it was not feasible to conduct interviews and depose Dinwoodie.

no sense" because the prior art he was purportedly trying to predate would be § 102(b)

prior art which, if the prior art met the requirements of that section, would invalidate a

patent regardless of the inventor's conception date.[258]  Therefore, Dinwoodie would

have gained nothing by claiming earlier conception.[259]

Plaintiff's discussion of § 102(b) is not relevant to whether defendant has

sufficiently pled its claim.  Moreover, plaintiff's argument that Dinwoodie's motive for the

alleged misconduct "makes no sense" again improperly asks to court to consider the

merits of defendant's claim.

Defendant's proposed amendment provides detailed identification of the entries

alleged to be altered and the evidence supporting the allegation that it was Dinwoodie

who made those alterations.[260]  Therefore, the court finds defendant has sufficiently

alleged its inequitable conduct claim.

### 2.  Violation of the Duty of Candor and Good Faith in the Motion to Supplement

Defendant filed its motion to supplement its motion to amend on April 5, 2016.[261]

Because that date is after the March 18, 2006 deadline for amending pleadings, "Rule

16 of the Federal Rules of Civil Procedure is . . . implicated," under which "[a] schedule

may be modified only for good cause and with the judge's consent."[262]  "Good cause"

exists if the schedule "cannot reasonably be met despite the diligence of the party

---

[258] *Id.* at 22.
[259] *Id.*
[260] D.I. 85, Ex. A at ¶¶ 84-98.
[261] D.I. 90.
[262] *ICU Med., Inc. v. Rymed Techs., Inc.*, 674 F. Supp. 2d 574, 577 (D. Del. 2009); Fed. R. Civ. P. 16(b)(4).

seeking the extension."[263]  "'In contrast to Rule 15(a), the good cause standard under

Rule 16(b) hinges on diligence of the movant, and not on prejudice to the non-moving

party.'"[264]

The court finds good cause exists for the filing of defendant's motion to

supplement because it could not have reasonably met the March 18, 2016 deadline

despite its diligent attempt to do so.  Plaintiff produced the documents on which

defendant relies for its March 18, 2016 motion to amend on February 11 and 19, 2016.

After it received those documents, defendant represents it diligently prepared its lengthy

Proposed Amended Answer, drafted its Motion to Amend, and filed it on the March 18,

2016 deadline to amend pleadings.[265]  Plaintiff produced the documents on which

defendant relies for its motion to supplement on February 26, 2016.  Defendant avers in

attempting to meet the March 18 deadline, it was unable to review the documents

produced on February 26, including Kern's expert report.[266]  Defendant had to review

those new documents, prepare its supplemented amended answer, and draft its motion

to supplement.  Defendant then filed that motion on April 5, 2016, just over two weeks

after the March 18 deadline.

In support of its motion to supplement, Defendant maintains after reviewing the

documents supporting its allegations in that motion, it discovered plaintiff and its

attorneys in the IPR of the '988 patent violated their duty of candor and good faith in

---

[263] FED. R. CIV. P. 16(b)(4) Advisory Committee's Notes (1983 Amendments).
[264] *ICU Med.*, 674 F. Supp. 2d at 577-78 (quoting *Roquette Freres v. SPI Pharma. Inc.*, C.A. No. 06-540-GMS, 2009 WL 1444835, at *4 (D. Del. May 21, 2009)).
[265] D.I. 97 at 5.
[266] *Id.* at 5-6.

dealing with the PTO by withholding documents from defendant in the litigation and then making misleading arguments to the PTAB that were contradicted by the withheld documents.[267]

Pursuant to 37 C.F.R. § 42.11, "[p]arties and individuals involved in the proceedings [before the PTAB] have a duty of candor and good faith to the Office during the course of a proceeding."[268]  The Rules further provide:

> By presenting to the Office . . . (whether by signing, filing, submitting, or later advocation) any paper, the party presenting such paper, whether a practitioner or non-practitioner, is certifying that . . . [t]o the best of the party's knowledge, information and belief, formed after an inquiry reasonable under the circumstances . . . [t]he allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation of discovery.[269]

On September 24, 2013, defendant filed an RFP of documents from plaintiff's prior litigation against SunLink, including "all expert reports or disclosures served under FED. R. CIV. P. 26(a)(2)."[270]  On October 29, 2013 defendant sent correspondence to plaintiff requesting it produce the documents before defendant's January 2014 statutory deadline for it IPR petition.[271]  Plaintiff did not produce the documents before that deadline.[272]  On February 26, 2016, plaintiff produced the expert report of Kern, SunLink's expert on the issue of patent validity.[273]  Kern was also an inventor of the Roof-Jacks product for which defendant has provided invalidity contentions in this case;

---

[267] D.I. 90 at 1-2; *id.*, Ex. A at ¶¶ 130-48.
[268] 37 C.F.R. § 42.11.
[269] 37 C.F.R. § 11.18(b(2)(iii).
[270] D.I. 90, Ex. C; *id.*, Ex. A at ¶ 137.
[271] *Id.*, Ex. D; *id.*, Ex. A at ¶ 137.
[272] *Id.*, Ex. A at ¶ 138.
[273] *Id.*, Ex. A at ¶ 138.

the same product that is described in the Frantzis reference relied upon by defendant in the '988 patent IPR.[274]

Kern's expert report describes and includes photographs of a prior art non-penetrating rooftop mounted solar panel assembly weighing between 3.5 and 3.69 pounds per quare foot, which he developed and installed himself in Palm Desert, California in 1992.[275]  Defendant alleges that, despite being in possession of Kern's expert report, plaintiff and its counsel made arguments in the IPR to suggest the components of Kern's Roof-Jacks product would have resulted in an assembly weighing greater than five pounds per square foot, that a long felt need existed for a lightweight, roof mounted photovoltaic system that does not require penetration of the roofing membrane, and that the arguments made by defendant in the IPR were identical to those made by SunLink in the prior litigation and should, therefore, be rejected by the Board.[276]  Defendant alleges plaintiff's arguments that its secondary considerations should be considered because "the information cited herein has long been part of the public record and associated with the '988 patent, because it [was] included in the prosecution history" and that "[PanelClaw] has had ample opportunity to test this evidence, and has chosen not to" were misleading and made with the intent to deceive the Board.[277]

At the time plaintiff made those arguments, plaintiff and its counsel were in possession of Kern's expert report which shows that components of the Roof-Jacks

---

[274] *Id.* at 3; *id.*, Ex. A at ¶ 138.
[275] *Id.*, Ex. A at ¶¶ 139-40.
[276] *Id.*, Ex. A at ¶¶ 141-48.
[277] *Id.*, Ex. A at ¶ 145 (alterations in original).

product were not heavier than the claimed weight ranges, and that lightweight, non-penetrating rooftop mounted assemblies falling within the claimed weight ranges were in the prior art.[278]  When plaintiff argued to the Board that defendant was presenting "essentially the same information as presented by" SunLink in the prior litigation, plaintiff knew that argument was incorrect because it knew it had not produced key documents on which SunLink's invalidity arguments were based.[279]  Finally, defendant alleges plaintiff's argument that "[PanelClaw] has had ample opportunity to test [its secondary considerations] evidence, and has chosen not to" was misleading because, when plaintiff made the argument, it was withholding documents from its earlier litigation that directly contradicted the evidence plaintiff was presenting during the IPR.[280]

Plaintiff argues its failure to produce Kern's expert report prior to the IPR cannot be the basis for alleging inequitable conduct before the PTAB because the Kern report is not prior art and a petition for IPR can only be based on prior art patents and printed publications.[281]  Kern's report, and any "installation" mentioned therein, is neither.[282]  Defendant, however, does not alleged plaintiff and its counsel withheld prior art from the PTO.[283]  Defendant's allegation is that plaintiff's counsel violated their duty of candor and good faith to the Board by not producing Kern's report to defendant in the litigation and then making arguments to the PTAB that were contradicted by Kern's report.[284]

---

[278] *Id.*, Ex. A at ¶¶ 143-44.
[279] *Id.* at 4; *id.*, Ex. A at ¶¶ 143-44.
[280] *Id.* at 4 (alterations in original); *id.*, Ex. A at ¶ 144.
[281] D.I. 94 at 22 (citing 35 U.S.C. § 311(b)).
[282] *Id.*
[283] *See* D.I. 90, Ex. A at ¶¶ 130-48.
[284] *Id.*, Ex. A at ¶¶ 130-48.

Plaintiff maintains defendant fails to adequately plead that plaintiff and its attorneys mischaracterized the Frantzis reference.[285]  Defendant makes no allegations that plaintiff mischaracterized the Frantzis reference.

Plaintiff also contends that the Kern's description and photographs of a prior art rooftop mounted solar panel assembly weighing between 3.5 and 3.69 pounds per square foot is directly contradicted by Frantzis which states the weight of the Frantzis system is 15-16 PSF.[286]  Defendant does not dispute the weight of the system described in Frantzis.  Its allegation is that plaintiff's counsel knew and had possession of Kern's expert report describing Kern's actual installation of a Roof-Jacks system, including "detailed photographs of the installation and provid[ing] calculations showing that the Palm Desert installation weighed between 3.5 and 3.69 pounds per square foot,"[287] which fell between the ranges required by the dependent claims of the '988 patent.

Plaintiff also argues defendant has not plead that its counsel made knowing false statements with the specific intent to deceive the PTO.[288]  Although defendant does allege counsel intended to deceive the PTO,[289] its inequitable conduct claim is based on counsel's violation of their duty of candor and good faith before the PTO.[290]

Defendant reiterates its allegations with respect to the alleged violation of the duty of candor and good faith to the Board during the IPR of the '988 patent are that: (1) plaintiff's counsel was in possession of Kern's expert report and did not produce it

---

[285] D.I. 94 at 23.
[286] *Id.*
[287] D.I. 90, Ex. A at ¶ 140.
[288] *See, e.g.*, D.I. 94 at 25.
[289] D.I. 90, Ex. A at ¶ 147.
[290] *Id.*, Ex. A at ¶¶ 130-31.

before defendant's IPR deadline; (2) defendant argued in its IPR petition that it would

have been obvious to construct the Roof-Jacks assembly at 2-4 pounds per square foot;

(3) plaintiff responded with arguments suggesting the components of the assembly were

too heavy to fall within that weight range, and that the long-felt need for a non-

penetrating lightweight assembly favored rejecting defendant's argument; and (4)

plaintiff then produced Kern's expert report, which shows both the Roof-Jacks assembly

constructed within 2-4 pounds per square feet, and that the invention did not satisfy any

such long felt need.[291]

The court determines the allegations defendant seeks to supplement its

proposed amended answer and counterclaims sufficiently pleads a violation of the duty

of candor and good faith before the PTO during the '988 IPR.  The court, therefore

grants defendant's motion to supplement.

## VI.   CONCLUSION

At Wilmington this 19th day of September, 2016, for the reasons discussed

above;

IT IS ORDERED, ADJUDGED, and DECREED that:

(1)     Defendant's Motion for Leave to Amend its Answer to the Second

Amended Complaint, Affirmative Defenses and Counterclaims (D.I. 84) is

GRANTED in part and DENIED in part;

(2)     Defendant's Motion for Leave to Supplement is Motion to Amend its

Answer to the Second Amended Complaint, Affirmative defenses and

---

[291] *Id.*, Ex. A at ¶¶ 133-47.

Counterclaim (D.I. 90) is GRANTED.


Dated: September 19, 2016                    /s/ Mary Pat Thynge